IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RONNIE HENSLEY, #142-524,             *

    Plaintiff                        *

       v                             *       Civil Action No. DKC-18-1170

DR. AYOKU OKETUNJI and                *
WEXFORD HEALTH SOURCES, INC.,
                                      *
    Defendants

**MEMORANDUM OPINION**

Self-represented Plaintiff Ronnie Hensley, an inmate currently confined at Jessup

Correctional Institution ("JCI"), initiated this action asserting civil rights violations under 42

U.S.C. § 1983 by prison health care provider Wexford Health Sources, Inc. ("Wexford") and

Wexford's employee, Dr. Ayoku Oketunji.  ECF No. 1, p. 1, 4.[1]  In his unverified complaint, Mr.

Hensley seeks unspecified money damages and medical treatment for orthopedic pain and

disability.  *Id.* at 3.  Mr. Hensley claims that he has not received adequate medical care for loss of

hearing and needs surgical repair of his right hand.  *Id.* at 5.  Essentially, he claims that his suffering

has increased because of Defendants' ongoing violation of the Eighth Amendment.  *Id.* at 4.

In response to the complaint, Defendants Wexford and Dr. Oketunji have filed a motion to

dismiss or in the alternative, motion for summary judgment, ECF No. 11, accompanied by an

affidavit and exhibits.  Mr. Hensley was advised of his right to respond and oppose the dispositive

motion (ECF No. 12) and has done so.  ECF No. 17.  The Medical Defendants filed a reply to Mr.

Hensley's opposition (ECF No. 18) which includes additional medical records generated after the

---

[1]    This opinion cites to pagination assigned by the court's electronic docketing system.

filing of their dispositive motion. Mr. Hensley has filed a surreply docketed as a supplemental opposition response. ECF No. 20.

The dispositive motion may be decided without a hearing. *See* Local Rule 105.6 (D. Md. 2018). For the reasons stated below, Mr. Hensley's surreply IS STRICKEN.[2] For reasons to follow, the claim against Defendant Wexford IS DISMISSED and summary judgment IS GRANTED in favor of Defendant Oketunji.

## Background

The parties do not dispute that Mr. Hensley is in his mid-sixties with a significant medical history of osteoarthritis and degenerative joint disease affecting the bones and joints in the cervical spine, knees, and right hand and thumb; nor do they contest that Mr. Hensley suffers bilateral sensorineural hearing loss that is worse in the right ear. ECF No. 11-6, Affidavit of Ayoku Oketunji, M.D., ¶ 5. Because of his conditions, Mr. Hensley is a chronic care patient who is scheduled for regular evaluation by physicians and mid-level health care providers who manage and monitor his conditions. *Id.,* Aff., ¶ 6.

Prior to January 1, 2019, Defendant Wexford was a private health care provider under contract with the Maryland Department of Public Safety and Correctional Services ("DPSCS") to

---

[2] The Medical Defendants moved to strike the surreply. ECF No. 21. Surreply memoranda are not permitted unless otherwise ordered by the court, *see* D. Md. Local R. 105.2(a) (2018), and are generally disfavored in this District. *See Chubb & Son v. C & C Complete Servs., LLC*, 919 F. Supp. 2d 666, 679 (D. Md. 2013). They may be permitted "when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply," *TECH USA, Inc. v. Evans*, 592 F. Supp. 2d 852, 861 (D. Md. 2009). This exception is not applicable here. In his response, Mr. Hensley offers counter-argument to the Medical Defendants' dispositive motion and reply, essentially reiterating his opposition to the conclusions reached by medical personnel. Except for Mr. Hensley's statement that he was justified in failing to participate in physical therapy due to lengthy "wait time" beyond the scheduled appointment (ECF No. 20 at 3), none of Mr. Hensley's arguments is responsive to issues raised by Defendants "for the first time" in their reply memorandum. Accordingly, the motion to strike surreply (ECF No. 21) is granted.

provide primary health care services and utilization management services for Maryland prisoners.[3]
*Id.,* Aff., ¶ 1. Defendant Dr. Oketunji initially was employed by Wexford as a physician to provide
primary health care services to prisoners. *Id.,* Aff., ¶ 1. On November 8, 2016, he became the
Medical Director for JCI. *Id.,* Aff., ¶ 2. After his appointment as Medical Director, Dr. Oketunji
occasionally provided clinical services directly to JCI prisoners, but primarily managed the
delivery of clinical services to those prisoners. *Id.*

### A.     Mr. Hensley's Allegations

Mr. Hensley alleges that Defendants have delayed necessary treatment for neck pain, upper
and lower extremity pain, and hearing loss. ECF No. 1 at 4-5. He also complains that since
December of 2015 he suffered pain in the right hand below the thumb, and that necessary surgery
was delayed until he filed this lawsuit. ECF No. 1 at 5; ECF No. 17 at 4-5.

Mr. Hensley states that in 2016 he was referred to Dr. Eugene Koh, a neurologist at the
University of Maryland Medical System ("UMMS"), who told Mr. Hensley that without neck
surgery his condition would worsen and become more painful. ECF No. 1 at 4-5. Mr. Hensley
claims that surgery was never scheduled and one physician (presumably a Wexford employee) told
him the surgery was too expensive and would not be approved. *Id.*

In 2017, Mr. Hensley returned to Dr. Koh for another MRI, and was told by Dr. Koh that
he needed immediate surgery. ECF No. 1 at 4. Surgery was not authorized, and Mr. Hensley
claims as a result now to suffer "24 hours a day" with severe headaches, impaired vision, loss of
sensation in both hands causing him to drop items, and trouble sleeping due to neck and back pain.
*Id.* at 4-5.

---

[3]     On January 1, 2019, another health care provider commenced a new contract with DPSCS.
*See* http://www.corizonhealth.com/Corizon-News/corizon-health-to-partner-with-the-state-of-maryland (last reviewed January 22, 2019).

Mr. Hensley further claims that in August of 2017 an audiologist ordered a hearing aid that was not provided. As a result, he has lost 50% of his hearing and cannot hear the calls to meals or follow religious services. ECF No. 1 at 5.

Finally, Mr. Hensley states that Dr. Manning, a "prison specialist," placed casts on his right hand and forearm and provided medication, all of which only masked the problem with his thumb and hand. *Id.* at 5. In December 2017, x-rays revealed the presence of two jagged bones which required pins to repair. *Id.*

## B. Defendants' Assertions

Defendants argue that Mr. Hensley has failed to state a constitutional claim under 42 U.S.C. § 1983. They assert that record evidence demonstrates that Mr. Hensley has received constitutionally adequate medical care during the relevant times of his incarceration and that Mr. Hensley's allegations of medical negligence are not judicially actionable in this forum.

Wexford contends it is entitled to dismissal because Mr. Hensley fails to identify unconstitutional policies and procedures that were the motivating force behind its employees' alleged denial of medical care, and because the doctrine of *respondeat superior* is not recognized in civil rights actions brought pursuant to 42 U.S.C. § 1983. ECF No. 11 at 33-34. Dr. Oketunji contends that he did not personally participate in any wrongdoing, that the treatment rendered did not violate the Eighth Amendment's prohibition against cruel and unusual punishment, and that he was named in the complaint solely on the basis that "he is in charge of medical" and thus responsible for all medical decisions regarding Mr. Hensley's treatment and care. ECF No. 1 at 3-4; ECF No. 11 at 34-35.

The uncontroverted medical record provides the following information, which is broken down into allegations concerning arthritic pain of multiple joints and bones and audiology problems.[4]

i.     Arthritic Pain

Mr. Hensley states that his neck and back pain began in 2008. ECF No. 17 at 4. His allegations here, however, focus on a failure to provide comprehensive treatment, including surgery, after a medical assessment performed in September of 2016. ECF No. 17 at 4.

Mr. Hensley complained to Wexford personnel concerning pain in the back of his neck affecting his range of motion as early as January 2, 2015, when he reported a history of cervical pain effectively treated with nerve blocks. ECF No. 11-4 at 1, 4. Mr. Hensley denied injury to the neck or loss of bowel or bladder function, but range of motion was decreased. *Id.* An x-ray of the cervical spine and a prescription for Indomethacin was added to the muscle relaxer previously prescribed.[5] ECF No. 11-4 at 1-2; ECF No. 11-5 at 128. X-rays showed moderate degenerative joint disease with prominent bridging osteophytes, but no evidence of acute fracture, dislocations, subluxation or abnormal alignment. ECF No. 11-5 at 128.

---

[4]     Unless otherwise noted, this Memorandum Opinion cites to medical records referencing Mr. Hensley's treatment. Medical records reflecting treatment rendered between January 2, 2015 and December 21, 2017 are found at ECF No. 11-4, while those referencing later treatment between December 26, 2017 and June 14, 2018 are found at ECF No. 11-5 and records relating to treatment subsequent to June 26, 2018 are found at ECF No. 18-1. Dr. Oketunji's summary of treatment, provided in his Affidavit, is found at ECF No. 11-6. Only those medical visits relevant to the health issues raised in this complaint are summarized in this opinion.

[5]     Indomethacin, a nonsteroidal anti-inflammatory drug ("NSAID") reduces hormones that cause inflammation and pain and is used to treat acute and chronic arthritis and other skeletal conditions.     *See*  http://ww\v.drugs.com/search.php?searchterm=indomethacin  (last reviewed January 22, 2019). Mr. Hensley also was receiving Baclofen, a muscle relaxer. ECF No. 11-4 at 2.

X-ray results were reviewed and physical examination was performed on February 10, 2015. No skeletal tenderness or joint deformity was found, and Mr. Hensley was continued on pain medication, including Indomethacin and Baclofen. ECF No. 11-4 at 4. Mr. Hensley was provided a brace for knee pain. *Id.* at 6. Mr. Hensley's complaint of foot and hand pain were confirmed upon examination during a February 26, 2015, chronic care clinic visit. *Id.* at 7. Amitriptyline[6] was added to his pain medications. *Id.* at 8. Pain medications were renewed during a chronic care visit on May 5, 2015. ECF No. 11-4 at 13-14.

During an unrelated medical visit concerning a toenail infection, Mr. Hensley, whose family had a history of diabetes, complained on July 24, 2015, of loss of sensation and numbness in the toes and feet. Lab testing to rule out diabetes was requested. ECF No. 11-4 at 17.

On August 4, 2015, Mr. Hensley complained during a chronic care clinic that his degenerative joint disease ("DJD") pain had worsened. ECF No. 11-4 at 23-29. Musculoskeletal evaluation was unremarkable, but a prescription for Glucosamine Chondroitin[7] to promote bone and joint health was added to his medication regimen for his arthritis. *Id.* During an October 29, 2015, chronic care clinic follow-up, his musculoskeletal evaluation was unremarkable and his multiple joint pain was improved. ECF No. 11-4 at 34-35.

At his next clinic visit on January 12, 2016, Mr. Hensley reported worsening pain in the upper extremities, elbows, wrist, and hand. ECF No. 11-4 at 36-38. No skeletal tenderness or deformity was seen and x-rays of the right hand and forearm were normal. ECF No. 11-4 at 39.

---

[6]   Amitriptyline is an anti-depressant which is also used to treat neuropathic pain. *See* http://www.drugs.com/amitriptyline.html (last reviewed January 23, 2019).

[7]   Glucosamine affects molecules that form cartilage, and is often taken together with chondroitin, which is derived from cartilage. It is used as an integrative therapy in those with osteoarthritis to reduce reliance on NSAIDs. *See* http://www.mayoclinic.org/drugs-supplements/glucosamine/background!hrb-20059572 (last reviewed January 23, 2019).

Prescriptions for Baclofen, Indomethacin, and Glucosamine Chrondroitin were reordered. *Id.* at 38.

On February 18, 2016, Mr. Hensley reported new wrist pain described as sharp and shooting and accompanied by numbness and burning in the fingers. ECF No. 11-4 at 41-43. Neurontin was prescribed for these complaints.[8]

On March 31, 2016, Mr. Hensley complained again of right wrist and hand pain accompanied by tingling and burning, as well as severe cervical spine pain radiating to the right arm, exacerbated by bending and eased with NSAIDs. ECF No. 11-4 at 45-46. The hand pain was mild but worsened with movement and also improved with NSAIDs. *Id.* His hand was tender on examination and moderately painful during motion. *Id.*

On April 27, 2016, Mr. Hensley reported that his neck pain was not resolved, but admitted he was only taking his Neurontin once a day, rather than three times daily as prescribed. ECF No. 11-4 at 47-48. His spine was tender on examination. *Id.*

At his May 11, 2016 chronic care clinic visit, Mr. Hensley complained of several months of stiffness and pain in the neck, shooting pain down his arms, and pain and swelling of the right hand with increasing difficulty opening and closing the hand. ECF No. 11-4 at 49-50. His cervical spine was tender and moderately painful upon motion. *Id.* His right hand showed Heberden's nodes[9] and swelling of the right, first metacarpal joint. *Id.* X-rays of Plaintiff's cervical spine and

---

[8] Neurontin (gabapentin) is used to treat neuropathic pain. *See* http://drugs.com/neurontin.html (last reviewed January 23, 2019).

[9] Heberden's nodes are bony swelling that form on the hands in osteoarthritis patients. *See* https://www. belman·ahealth.com/causes-heberdens-node-treated/ (last reviewed January 23, 2019).

right hand showed DJD with large osteophytes[10] at the C2-C7 disc levels. ECF No. 11-5 at 132. Degenerative changes were found in the right hand at the interphalangeal joint. *Id.* at 133.

On June 8, 2016, Mr. Hensley complained of severe, constant aching and numbness in the neck that could not be significantly relieved. The neck was tender, but no weakness was present. Tenderness was found in the metacarpal joints of the hands. ECF No. 11-4 at 53-54. Tramadol[11] was added to the existing pain medication (Neurontin) and Baclofen, a muscle relaxer, and a consult request for pain management was entered. *Id.*

On July 8, 2016, Mr. Hensley saw UMMS specialist Dr. Eugene Koh for an orthopedic consult related to his cervical pain. ECF No. 11-5 at 78-86. He reported chronic neck pain since 2008 that was progressively worsening. Mr. Hensley, who is right-hand dominant, also noted sharp, stabbing, radiating pain to his right hand causing numbness in his fingertips, as well as recent right thumb and elbow pain. *Id.* at 80. He indicated problems with holding a pencil, buttoning his shirts, and dropping objects held in his right hand. *Id.* Dr. Koh found mild swelling and tenderness in the right carpometacarpal ("CMC") joint.[12] Although Mr. Hensley had difficulty with rapid alternative hand movements, he was able to open and close his fists

---

[10] Osteophytes (bone spurs) develop in or near joints and connective tissue as a result of stress, pressure, or arthritic degeneration. They are not themselves painful or even harmful, but if they come into contact with nerves, muscles, or other soft tissue, they can cause pain, restrict movement, and perhaps even further injury to the affected area. *See* http://www.laserspineinstitute.com/back_problems/spinal_bone_spurs/osteophytic/ (last reviewed January 23, 2019).

[11] Tramadol (Ultram) is a narcotic-like pain reliever used to treat moderate to severe pain. *See* http://www.drugs.com/ultram.html (last reviewed January 23, 2019).

[12] Thumb arthritis comes with aging as cartilage wears away from the ends of the bones that form the joint at the base of the thumb, also known as the carpometacarpal (CMC) joint. *See* https://www.mayoclinic.org/diseases-conditions/thumb-arthritis/symptoms-causes/syc-20378339 (last reviewed January 22, 2019).

approximately ten times in ten seconds. *Id.* Mr. Hensley denied any lower extremity symptoms. *Id.*

On August 22, 2016, Mr. Hensley met with a nurse practitioner to discuss MRI results. ECF No. 11-4 at 63-64. He complained of right thumb pain starting in January 2016, and rated the pain as burning, constant, and a 6 on a scale of 10. Pain medications were continued and a consult placed for Mr. Hensley to return to Dr. Koh. *Id.*

During his September 14, 2016, chronic care visit, Mr. Hensley reported occasional instability in the knees and ongoing problems with his right thumb. ECF No. 11-4 at 65-66. His gait was stable. *Id.* Dr. DeRose diagnosed right thumb tendinitis[13] and possible De Quervain's syndrome[14] and recommended Mr. Hensley be referred to the in-house orthopedic surgeon for assessment and possible steroid injection. *Id.* Mr. Hensley's complaints of peripheral neuropathy related to his feet were addressed, and examination revealed diminished sensation. *Id.* Diagnostic lab-work was ordered and a consult for assessment of Mr. Hensley's thumb was submitted to utilization management for the purposed of ruling out tendinitis. *Id.*

---

[13] Tendinitis is inflammation of a tendon, often developing after degeneration (tendinopathy) and may involve inflammation of the tendon sheath lining. Symptoms usually include pain with motion and tenderness with palpation. Chronic deterioration or inflammation of the tendon or tendon sheath can cause scars that restrict motion. Diagnosis is clinical, sometimes supplemented with imaging, and treatment includes rest, NSAIDs, and sometimes corticosteroid injections. *See* https://www.merckmanuals.com/professionallmusculoskeletal-and-connective-tissue-disorders/bursa,-muscle,-and-tendon-disorders/tendinitis-and-tenosynovitis (last reviewed January 23, 2019).

[14] De Quervain's syndrome (De Quervain's tenosynovitis) is a painful condition that affects the wrist tendons. It occurs when the two tendons around the base of the thumb become swollen, causing the sheaths (casings) covering the tendons to become inflamed. This puts pressure on nearby nerves, causing pain and numbness. *See* https://familydoctor.org/condition.lde-quervains-tenosynovitis/ (last reviewed January 23, 2019).

On July 8, 2016, a consultation request was submitted for an MRI at UMMS. ECF No. 11-4 at 58-59. Mr. Hensley complained of dull right knee pain, which he rated at 4 out of 10. *Id.* An x-ray revealed degenerative changes with reduced joint space and no evidence of acute injury or alignment abnormality. *Id.* at 60-61. Extra-strength Tylenol was added to Mr. Hensley's pain regimen. *Id.*

The cervical spine MRI completed on August 10, 2016, and reviewed by Dr. Koh on September 23, 2016, showed mild spinal canal narrowing at the C5-C6 level due to disc osteophyte formation and moderate to severe right neuroforaminal narrowing at the C3- C4. ECF No. 11-5 at 121-122. No spinal cord changes or spinal canal masses were seen. *Id.* Dr. Koh's assessment was that Mr. Hensley's cervical complaints were due to the foraminal stenosis found on his MRI study, causing cervical radiculopathy.[15] *Id.* Dr. Koh recommended an anterior cervical decompression with fusion ("ACDF")[16] at the C3-C5 levels and continuing Neurontin.[17] ECF No.

---

[15] Radiculopathy describes a range of symptoms produced by the pinching of a nerve root in the spinal column. The pinched nerve can occur at different areas along the spine (cervical, thoracic or lumbar). Symptoms of radiculopathy vary by location but frequently include pain, weakness, numbness and tingling. *See* https://www.hopkinsmedicine.org/healthlibrary/conditions/nervous_system_disorders/acute_radiculopathies_134,11 (last reviewed January 23, 2019).

[16] Anterior cervical discectomy and fusion (ACDF) is a type of neck surgery that involves removing a damaged disc to relieve spinal cord or nerve root pressure and alleviate corresponding pain, weakness, numbness, and tingling. A discectomy is a form of surgical decompression, so the procedure may also be called an anterior cervical decompression. A fusion surgery is done at the same time as the discectomy to stabilize the cervical segment and involves placing a bone graft and/or implants where the disc originally was in order to provide stability and strength to the area. While this surgery is most commonly done to treat a symptomatic cervical herniated disc, it may also be done for cervical degenerative disc disease or to remove bone spurs (osteophytes) caused by arthritis and to alleviate the symptoms associated with cervical spinal stenosis. *See* https://www .spine-health.com/treatment/spinal-fusion/acdf-anterior-cervical-discectomy-and-fusion (last reviewed January 23, 2019).

[17] Dr. Koh would later change his diagnosis and provide a treatment plan to address the C4-C6 levels of the spine. *See id*. at 18.

11-5 at 83-85.  The risks and benefits of the procedure were explained, and Mr. Hensley indicated he wished to proceed.  *Id.* at 84.  Despite Mr. Hensley's approval, the procedure was not identified as emergent or urgent by Dr. Koh.  *Id.*  A consult was placed for authorization of the ACDF procedure.  ECF No. 11-4 at 68.

On December 20, 2016, Mr. Hensley was examined by on-site orthopedic specialist Lawrence Manning, M.D. for his right hand and knee complaints.  ECF No. 11-5 at 73.  Mr. Hensley exhibited mild edema of the right hand and loss of flexion at the thumb.  *Id.*  He had active range of motion of the right knee with no swelling and minimal tenderness.  *Id.*  X-rays of the right hand and knee revealed degenerative changes in the proximal interphalangeal joint ("PIP") and distal interphalangeal ("DIP") joints of the first digit of the hand and mild degenerative joint disease in the right knee.  *Id.*  Dr. Manning's impression was tendinitis of the right thumb and osteoarthritis of the right knee.  *Id.*  Dr. Manning recommended topical NSAIDs for the right hand and knee; a six-day pack of Medrol steroids for inflammation; a knee sleeve; and a commercial thumb splint.  *Id.*  In the interim, Dr. Manning placed a splint on Mr. Hensley's hand.  *Id.*

Mr. Hensley reported at a follow-up assessment on January 26, 2017, that he had not obtained adequate relief for his pain with his current pain medication regimen which included Neurontin, Capsaicin cream, and Medrol.  *Id.* at 77.  He was told the knee sleeve had been ordered and the thumb splint request was approved, and he should continue his medications.  *Id.*  Tylenol Extra-Strength and glucosamine were added to his medication regimen.  *Id.*

During a March 1, 2017, follow-up visit, Mr. Hensley reported the right knee sleeve helped but he still experienced buckling, and that his thumb pain was 4 out of 10.  He received additional

dose of pain medication (Tylenol Extra-Strength) and his Neurontin prescription was renewed. ECF No. 11-4 at 79-80.

On March 23, 2017, Mr. Hensley was given an increase in his Neurontin dose due to worsening of his neck pain and radiculopathy. He reported that his back hurt and his right thumb was swollen. ECF No. 11-4 at 83-85.

On March 30, 2017, Mr. Hensley was referred to Hangar Orthotics for the fitting of a splint that did not contain metal. ECF No. 11-4 at 86-87. In the interim, he received an ace wrap. *Id.* Mr. Hensley's thumb was tender with pain radiating to the forearm. A Finklestein test was positive.[18] Following the examination, Mr. Hensley was walked to the pharmacy after reporting that he had not received his Extra-Strength Tylenol. *Id.*

On May 22, 2017, Mr. Hensley complained of sharp neck pain travelling to the back of his right shoulder, causing blurred vision in his right eye and ringing in his ear. ECF No. 11-4 at 90-91. He inquired as to his back surgery and further evaluation of his thumb and wrist pain. *Id.* Examination revealed misalignment of the cervical spine and mild pain upon motion. *Id.* His Neurontin dose was increased and a new pain medication, Meloxicam,[19] added to his pain medication regimen. *Id.*

During a May 25, 2017, chronic care visit, Mr. Hensley reported chronic neck pain, right knee pain and swelling, and right thumb and wrist pain consistent with tenosynovitis which occurred if he used his hands a lot. ECF No. 11-4 at 92. On June 15, 2017, Mr. Hensley traveled off-site to Hangar Orthotics, where he received a right-hand splint. *Id.* at 98-99.

---

[18] This is a test that is used to diagnose de Quervain tenosynovitis. *See* https://1emedicine.medscape.com/article/327453-clinical#b4 (last reviewed January 24, 2019).

[19] Meloxicam (Mobic), an NSAID, reduces hormones that cause inflammation and pain in the body. *See* http://www.drugs.com/mobic.html. (last reviewed January 24, 2019).

On June 30, 2017, Mr. Hensley reported hearing a "pop" in his right hand and felt worsening pain. *Id.* at 100-101. His hand and cervical pain symptoms were discussed, and Mr. Hensley was told he would be evaluated by the Medical Director for surgical reassessment after conservative treatment of his conditions with medication. *Id.* Pain medications were continued with an increase in the Mobic dosage, and Mr. Hensley was scheduled for a pain management evaluation in the chronic care clinic. *Id.*

A week later, on July 6, 2017, Mr. Hensley was examined by Dr. DeRosa after reporting cervical pain and restriction in movement on the right side of the neck, radiating pain through the shoulder down to the elbow, an inability to shrug, and problems picking items up due to loss of finger strength. ECF No. 11-4 at 102-103. On exam, Mr. Hensley had good strength in all parts of his arm and fingers with reduced sensation by 50% in the fingers and 20% in the right arm laterally. His thumb tenosynovitis was documented, and a scheduled follow-up with Dr. Manning was noted to be still outstanding. *Id.* Dr. DeRosa planned to submit consult requests for cervical spine surgery with Dr. Koh if still desirable and sought reassessment by Dr. Manning for possible steroid injection to treat the tenosynovitis. *Id.*

On or about July 13, 2017, Mr. Hensley's ACDF surgery at C3-5 was approved. *Id.* at 169. Dr. Koh later changed his assessment, and on October 27, 2017, recommended surgery at the C4-C6 levels. ECF No. 11-6, Oketunji Aff. at ¶ 26. Mr. Hensley also was approved for reevaluation by Dr. Manning for his right thumb to develop a treatment plan, including possible steroid injection. ECF No. 11-4 at 170.

On August 1, 2017, Dr. Manning examined Mr. Hensley for right knee and thumb pain. ECF No. 11-4 at 202. Dr. Manning diagnosed osteoarthritis of the carpometacarpal joint and

prescribed Voltaren gel[20] and continued use of the thumb splint.  *Id.*  A follow-up in 5-6 weeks was recommended.  *Id.*  The follow-up and gel prescription were approved by Dr. Oketunji.  *Id.* at 106-107, 171-172.

On August 4, 2017, a consult request authorizing follow-up with Dr. Manning was placed by Dr. Oketunji.  *Id.* at 171-172.  On August 7, 2017, a non-formulary request for approval of Voltaren gel was submitted by Dr. Oketunji and approved.  *Id.* at pp. 106-107.

On August 8, 2017, Mr. Hensley was seen by Dr. DeRosa, where he continued neck pain and stiffness with partial relief by neck cracking.  *Id.* at 104-105.  Mr. Hensley reported no change in strength and sensation and again expressed his desire for cervical spine surgery.  *Id.*  Dr. DeRosa informed Mr. Hensley that the ACDF procedure would likely give only 50/50 odds of correcting his pain.  *Id;* Oketunji Aff., ECF No. 11-6, ¶ 27.  Because there was no loss in strength, Dr. DeRosa suspected Mr. Hensley's problem of dropping objects was sensory in nature and recommended treating this neuropathic component of his condition aggressively by prescribing the maximum dose of Neurontin and adding a tricyclic antidepressant.  *Id.*

On September 5, 2017, Mr. Hensley complained of neck pain.  He was informed that he had been approved for surgery.  *Id.* at 115-116.  A prescription for Robaxin[21]  was added.  *Id.*

On September 8, 2017, Dr. Koh examined Mr. Hensley and assessed cervical radiculopathy with C4/C5 pain distribution.  *Id.* at 213.  Dr. Koh recommended an MRl of the cervical spine and

---

[20]   Voltaren gel (diclofenac sodium topical gel) is a topical NSAID used for the relief of the pain of osteoarthritis, such as the knees and those of the hands.  *See* https:l/www.rxlist.com/voltaren-gel-drug.htm#indications_dosage (last reviewed January 24, 2019).

[21]   Robaxin (methocarbamol), a muscle relaxant, blocks nerve impulses (or pain sensations) sent to the brain.  It is used together with rest and physical therapy to treat skeletal muscle conditions such as pain or injury.  *See* http://w\vw.drugs.com/Robaxin.html (last reviewed January 24, 2019).

right shoulder and possible ACDF surgery at C3-C5 was again discussed as a treatment option. *Id.* Follow-up evaluation with Dr. Koh was recommended after completion of the MRI. These recommendations were reviewed and consult requests submitted. *Id.* at 174-177. Dr. Oketunji told Mr. Hensley on September 25, 2017, that the MRI studies and follow-up with Dr. Koh had been approved. *Id.* at 178.

On October 3, 2017, Mr. Hensley was reevaluated by orthopedist, Dr. Manning, for his right thumb. *Id.* at 203. No new changes were identified on exam. *Id.* Because the Voltaren gel was deemed a security risk because of its metal tubing, it was recommended that Mr. Hensley be prescribed Naproxen 500 mg, continue use of his commercial splint, and return for reassessment in 2-3 months.

On October 5, 2017, Dr. Oketunji issued a consult request on Plaintiff's behalf for authorization for his reevaluation by Dr. Manning in 2-3 months for his right hand. *Id.* at 179-180. The MRI conducted October 18, 2017, revealed multi-level degenerative changes with moderate foraminal stenosis at the C3-C6 levels. *Id.* at 251-252. No spinal cord stenosis or abnormal cord signal was observed. *Id.* The right shoulder MRI revealed low to moderate grade bursal surface tearing. *Id.* at 253-254.

As previously noted, on October 27, 2017, Dr. Koh met with Mr. Hensley and changed his diagnosis and surgical plan to recommend ACDF at the C4-C6 levels. *Id.* at 214.[22] Dr. Koh did not recommend that the procedure needed to be performed immediately; surgical intervention remained elective. ECF No. 11-5, Aff. ¶ 26.

---

[22] Dr. Koh's earlier recommendation was for an ACDF of the C3-5 levels.

Mr. Hensley's hand pain continued. On December 5, 2017, Dr. Manning found conservative management had failed and recommended Mr. Hensley's referral to a hand surgeon for further treatment, including possible fusion of the first CMC joint. Mr. Hensley agreed to this plan. ECF No. 11-5, ¶ 18. Dr. Oketunji submitted a consult request for referral to a hand surgeon on December 7, 2017. ECF No. 11-6 at 53-54.

Mr. Hensley visited Dr. DeRosa in the chronic care clinic on December 8, 2017. Contrary to what he discussed with Dr. DeRosa about the success rate of his surgery in August 2017, and despite having been told that the chance of successful surgery was 50%, Mr. Hensley stated to Dr. DeRosa that his cervical surgery had a high success rate and that if surgery was not provided his condition would worsen. *Id.* at 123-125. At this juncture, Mr. Hensley's original cervical spine surgery (at the C3-5 level) had been approved and Mr. Hensley had a pending surgical consult with the hand surgeon for his right thumb. *Id.* Slight tenderness was noted in the cervical spine and over the right shoulder, and Mr. Hensley showed weakness in the upper left arm. *Id.* Naproxyn was discontinued due to gastric issues, but Mr. Hensley remained on his other pain medications, including Neurontin, Effexor and Amitriptyline. *Id.* Additionally, a consult for the proposed revised plan for cervical spine surgery was submitted at the direction of Dr. Oketunji. *Id.*

On or about December 14, 2017, Mr. Hensley was approved for hand surgery. *Id.* at 568. The case was discussed with Dr. Oketunji, who recommended that Mr. Hensley receive Tramadol while awaiting a referral back to the specialist for his cervical spine and shoulder pain. *Id.* at 128. A consult request was written for authorization for follow-up with Dr. Koh for surgery. *Id.* at 184-185. Mr. Hensley was seen on December 28, 2017, for follow-up regarding gastric complaints, audiology needs and the consult with the hand surgeon. *Id.* at l30-131.

Dr. Oketunji noted that Mr. Hensley was approved for neurosurgical assessment for his cervical spine complaints on or about January 1, 2018. ECF No. 11-5 at 58. Mr. Hensley continued to report neck pain, and was administered Tramadol and Metropolol, a blood pressure medication. ECF No. 11-5 at 4.

Mr. Hensley complained of neck pain radiating to the right clavicle, arm and back, and expressed fear that he might become paralyzed on January 19, 2018. ECF No. 11-5 at 8. He was assured his consult had been approved and that he would be scheduled for follow-up. The February 15, 2018, follow-up led to the renewal of his Tramadol pain medication while awaiting approval for surgery. *Id.* at 9. Mr. Hensley was informed his hand surgery had been approved on February 20, 2018. *Id.*

Mr. Hensley was examined by hand specialist Ngozi Akabudike, M.D. on February 27, 2018, who found prominence in the right thumb metacarpal base with exquisite tenderness to palpation and positive grind in the CMC of the thumb joint. ECF No. 11-6 at ¶ 19. X-rays showed narrowing and obliteration of the right thumb CMC joint space with erosive arthropathy and a cyst in the subchondral bone. ECF No. 11. Surgical intervention known as arthroplasty with a palmis graft was recommended. *Id.*

Mr. Hensley was examined by Dr. DeRosa on March 8, 2018, who noted reconstructive surgery for the right hand was approved and a return to the spinal surgeon had been recommended. ECF No. 11-5 at 15-16.

Mr. Hensley was reevaluated by NP Awanga on March 26, 2018, for continuation of his pre-operative work-up for his hand surgery and review of his lab work, which was posted on this date. It was noted that Mr. Hensley was cleared for hand surgery scheduled for March 28, 2018.

ECF No. 11-5 at 20-21.  Mr. Hensley underwent out-patient right hand surgery for his CMC on March 28, 2018, which included arthroplasty with palmaris graft.  ECF No. 11-5 at 22, 90-97.

Mr. Hensley's orthopedic\neurosurgical assessment was approved and in the process of being scheduled for follow-up related to surgical intervention on his cervical spine on April 3, 2018.  ECF No. 11-5 at 22.

Post-surgical follow-up for the hand surgery occurred on April 16, 2018.  ECF No. 11-5 at 24, 104-106.  The surgeon found the hand "well healed" and recommended Mr. Hensley continue to use a splint and start occupational/physical therapy on May 29, 2018.  *Id.* at 136-137.

A consult request referring Mr. Hensley to Mercy Hospital neurosurgeon Charles Park, M.D. (rather than his previous orthopedic surgeon, Dr. Koh) was submitted on June 6, 2018.  ECF No. 11-6 at ¶ 28.  Defendants explain this departure because DPSCS security concerns led to a decision to limit specialty care referrals to UMMS, and because Dr. Park, a neurosurgeon, might provide better insight into the need for surgery, given that Mr. Hensley's complaints were largely neurological in nature (numbness and tingling in the right upper extremity) and strength in the right upper extremity had remained essentially unaffected.  *Id.*  Mr. Hensley was seen by Dr. Park on June 14, 2018.  ECF No. 11-5 at 141-146.  On examination, Mr. Hensley had normal range of motion in his neck and no instability or atrophy of the cervical spine was observed.  No abnormalities in his range of motion, symmetry, or anatomy was noted in the upper or lower extremities.  *Id.*  Muscle tone was normal, and Mr. Hensley had normal strength in the left deltoids, biceps, wrist extension, triceps, grip, iliopsoas, quadriceps, dorsiflexion and plantar flexion.  *Id.*  Plaintiff had 5/5 strength in the right deltoids, biceps, iliopsoas and quadriceps, as well as proper dorsiflexion and plantar flexion.  A slight decreased strength in the right wrist extension, triceps, and grip was found, but Mr. Hensley had normal finger to nose coordination and sensation.  Dr.

Park interpreted the October 2017, cervical MRI as showing mild spondylosis and recommended further conservative treatment with physical therapy and spinal epidural injection, with surgical intervention considered only as a last resort. *Id.* at 143. Physical therapy consultation was promptly placed by Wexford staff. *Id.*

Mr. Hensley was approved for an updated MRI of the cervical spine and will return to Dr. Park as recommended for further assessment after completion of the MRI. ECF No. 11-6 at ¶ 30.

ii.    Audiology Problems

Mr. Hensley was seen for his complaint of hearing loss on August 15, 2017. ECF No. 11-6, ¶ 7. Although examination showed that Mr. Hensley's hearing was grossly intact, an audiology consult was submitted. *Id.*

On September 13, 2017, Mr. Hensley received an audiology assessment from independent contractor Ross Cushing, Au.D. ECF No. 11-6, ¶ 8; ECF No. 11-4 at 247. Mr. Hensley told Dr. Cushing that he suffered gradual hearing loss in his right ear along with an intermittent clicking sound. *Id.* Dr. Cushing found bilateral sensorineural hearing loss that was worse in the right ear. *Id.* A hearing aid for the right ear was recommended, along with retesting in six months to monitor asymmetry. *Id.*

The initial hearing aid order was lost. Medical staff discovered the error on December 28, 2017 and referred Mr. Hensley back to the appropriate medical providers to address the problem. ECF No. 11-6, ¶ 9. A second order for the hearing aid was still pending as of March 8, 2018, and the problem was again referred to the audiologist for resolution. *Id.,* ¶ 10. On March 29, 2018, Dr. Oketunji submitted a consult request for Mr. Hensley to return to the audiologist regarding his hearing aid. ECF No. 11-4 at 581-582. The request was approved (*id.* at 583) and on April 17,

2018, Mr. Hensley received the hearing aid from Dr. Cushing, who fitted the device. ECF No. 11-6, ¶ 11.

### C. Mr. Hensley's Response in Opposition

In his opposition, Mr. Hensley states that Dr. Koh recommended the ACDF procedure on September 23, 2016, after assessing that it "needed to be done as soon as possible to prevent further pain and damage." ECF No. 17 at 2. Mr. Hensley claims that Dr. Oketunji waited nearly a year, then scheduled a "reassessment" with Dr. Koh, who concluded on October 27, 2017, that his previous diagnosis of damage at C4-C5 had worsened to include damage from C4 to C6. ECF No. 17 at 2, 4. Mr. Hensley reiterates that his neck and back pain began in 2008, and that the ACDF procedure that was approved in July of 2017, had not been done as of August of 2018. *Id.* at 4. Mr. Hensley concludes this delay of more than two years following Dr. Koh's assessment on September 23, 2016, constitutes deliberate indifference. *Id.* at 4. He further notes that he suffered thumb pain for nearly three years before receiving surgery, and that delivery of his hearing aid was delayed. ECF No. 17 at 4-5.

### Standard of Review

In reviewing the adequacy of a complaint under the standard for a motion to dismiss pursuant to Fed. R. Civ. Proc. 12(b)(6), the court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005), citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir. 1997). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v.*

20

*Sorema N.A.*, 534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)).

The Supreme Court of the United States explained that a "plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Nonetheless, the complaint does not need "detailed factual allegations" to survive a motion to dismiss. *Id.* at 555. Instead, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 563. To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563, citing *Sanjuan v. Am. Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d, 247, 251 (7th Cir. 1994) (once a claim for relief has been stated, a plaintiff 'receives the benefit of imagination, so long as the hypotheses are consistent with the complaint').

In addition to arguing that they played little or no direct role in Mr. Hensley's care, the Medical Defendants provide exhibit evidence suggesting that Mr. Hensley nonetheless has

received constitutionally adequate treatment for his various medical conditions. Given this argument, the court has considered documents beyond those intrinsic to Mr. Hensley's complaint and therefore considers Defendants' motion as one for both dismissal and for summary judgment.

A motion for summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950). The moving party bears the burden of showing that there is no genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Pulliam*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)). Further, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court views the evidence in the light most favorable to the nonmoving party and draw all inferences in his

favor. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). That said, the court must nonetheless fulfill its "affirmative obligation" to "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted), quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (2011). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002), quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 199)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)). Notably, "'Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.'" *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 2d 331, 342 (D. Md. 2011) (quoting *Young v. UPS*, No. DKC-08-2586, 2011 WL 665321, at *20, 2011 U.S. Dist. LEXIS 14266, at *62 (D. Md. Feb. 14, 2011)). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55

F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary and the "nonmoving party's objections before the district court "served as the functional equivalent of an affidavit." *Id.* at 244-45 (internal citations omitted).

Mr. Hensley has not filed an affidavit under Rule 56(d), nor has he objected to Defendants' dispositive motion. Further, Defendants have provided Mr. Hensley extensive and updated medical records and other exhibits filed with the court. Thus, the court is satisfied that it is appropriate to address the motion submitted by the Medical Defendants as one for summary judgment.

## Analysis

### A.     Defendant Wexford

Wexford moves to dismiss the complaint allegations against it pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.  Liability is imposed under 42 U.S.C. § 1983 on "any person who shall subject, or cause to be subjected, any person . . . to the deprivation of any rights...."  Private businesses that employ individuals who act under the color of state law are considered "persons" under § 1983.  *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727–29 (4th Cir. 1999).  But, there is no *respondeat superior* liability under § 1983.[23]  *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004).  Rather, a private corporation may be held liable under § 1983 "only when an official policy or custom of the corporation causes the alleged deprivation of federal rights."  *Austin,* 195 F.3d at 728.

Mr. Hensley attributes the time leading up to audiology treatment and his hand surgery as well as the decision to exhaust conservative treatment, including physical therapy, to address serious neck and back pain to a corporation's desire to save money by restricting health care services to DPSCS prisoners.  Mr. Hensley also states that the "policy of approval of recommended medical care by outside doctors is very lengthy and unnecessary" and notes that "it took from September 23, 2016 when Dr. Koh recommended the ACDF procedure until July 13, 2017 to be approved...."  Opposition, ECF No. 17 at 3.  Mr. Hensley further alleges that he reported back and neck pain over a period of eight years, from 2008 through 2016, and regularly attended chronic care clinics, but his need for surgery, finally approved by Dr. Oketunji in 2017, has yet to be scheduled.  *Id.*

---

[23]    The doctrine of *respondeat superior* holds an employer legally responsible for wrongful acts done by an employee if such acts occur within the scope of employment.

Mr. Hensley cites no specific official Wexford policy or custom that allegedly deprived him of his constitutional rights. At most, he establishes that the conservative approach prior to delicate spinal intervention and hand surgery has extended his pain. Pain medications, however, have been administered, hand surgery has been completed, physical therapy has been prescribed, and Mr. Hensley is receiving regular evaluations to determine whether and when spinal surgery – with its danger of neurological injury – might be more appropriate. Mr. Hensley has failed to allege sufficient facts to establish Wexford's liability under § 1983, and the claim against Wexford will be dismissed.

### B. Defendant Dr. Oketunji

It is doubtful that Mr. Hensley has sufficient allegations to support a claim for supervisory liability against Dr. Oketunji, merely alleging that he is "in charge of medical." ECF No. 1 at 4. But even if he has, and even when coupled with Dr. Oketunji's own actions, Mr. Hensley has failed to substantiate his claim and summary judgment will be granted to Dr. Oketunji.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain," by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003), citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). Thus, to state an Eighth Amendment constitutional claim for denial of medical care, Mr. Hensley must demonstrate that Dr. Oketunji's action or inaction amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

To satisfy the subjective "deliberate indifference" component, the treatment rendered must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable

to fundamental fairness. *See Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990). "Deliberate indifference may be demonstrated by either actual intent or reckless disregard." *Miltier*, 896 F.2d at 851. Reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer v. Brennan*, 511 U. S. 825, 837 (1994).

"[S]ociety does not expect that prisoners will have unqualified access to healthcare." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (quoting *Hudson v. McMillian*, 503 U. S. 1, 9 (1992)). Therefore, to satisfy the objective "serious medical need" component, a prisoner's medical need must be "'life threatening or pose[ ] a risk of needless pain or lingering disability if not treated at once." *Anderson-El v. O'Keefe*, 897 F. Supp. 1093, 1096 (N.D. Ill. 1995) (quoting *Davis v. Jone*s, 936 F.2d 971, 972 (7th Cir. 1991)). In determining whether a deprivation of medical care amounts to an Eighth Amendment violation, courts must consider the severity of the medical need, the potential for harm if medical care was denied or delayed, and whether such harm resulted from the treatment, or lack thereof, rendered. *See Burns v. Head Jailor of LaSalle Cty.*, 576 F. Supp. 618, 620 (D. N. Ill. 1984).

Mr. Hensley received conservative treatment and ongoing reevaluation of his medical conditions. His hearing loss was promptly addressed, and hand surgery performed when conservative management proved ineffective. Mr. Hensley's belief that spinal surgery is the preferred option is belied by Dr. Koh's assessment, echoed by Dr. DeRosa, that the success rate for such surgery hovers at 50%. Mr. Hensley's spinal and other arthritic conditions continue to be reassessed and reevaluated but, as they are not causing neurological impairment, surgery is not the preferred option at this time.

To the extent that Mr. Hensley argues his pain medication is ineffective, evidence of unsuccessful medical treatment, such as the inability to reduce pain, is insufficient to establish deliberate indifference. *Baez v. Falor*, 2012 U.S. Dist. LEXIS 138574, 103,2012 WL 4356768 (W. D. Pa. 2012), citing *Thomas v. Coble*, 55 F. App'x 748, 749 (6th Cir. 2003); *Rochell v. CMS*, No. 4:05CV268, 2006 U.S. Dist. LEXIS 37943, at 10 (N. D. Miss. April 10, 2006) ("The constitution does not . . . guarantee pain-free medical treatment"). Mr. Hensley has received pain medication adjustments and some medications have been limited or removed from his pain management regimen due to side effects, including gastric issues. While it is unfortunate that Mr. Hensley is not pain-free, his condition has not been impacted or prolonged due to misconduct on the part of Wexford personnel.

### C. Supplemental Jurisdiction Over State Tort Claims

Any separate allegations of negligence or medical malpractice by Wexford and its personnel, under state law will not proceed here. There is no basis for diversity jurisdiction under 28 U.S.C. § 1332. Further, the court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367. The Maryland Health Care Malpractice Claims Act ("the Act"), Md. Code Ann., Cts. & Jud. Proc. § 3-2A-01, *et seq.*, requires that claims against a health care provider for medical injury be submitted to the Health Care Alternative Dispute Resolution Office (HCADRO) as a condition precedent to any judicial action. *See id.* at § 3-2A-02; *see also Roberts v. Suburban Hospital Assoc., Inc.*, 73 Md. App. 1, 3 (1987); *Davison v. Sinai Hospital of Balt. Inc.*, 462 F. Supp. 778, 779-81 (D. Md. 1978), *aff'd*, 617 F.2d 361 (4th Cir. 1980). This requirement applies to claims of medical negligence filed in federal court. *See Davison*, 462 F. Supp. at 779-81. When assessing a claim for medical malpractice, a court is required to focus on "whether the claim is based on the rendering or failure to render health care and not on the label placed on the claim." *Brown v.*

*Rabbit*, 300 Md. 171, 175 (1984). A court is required to dismiss an action for noncompliance with the Act where a party has failed to exhaust his or her administrative remedies under the Act. *See Roberts,* 73 Md. App. at 6; *see also Davison*, 462 F. Supp. at 781. As the proper standards of medical care are implicated here, Mr. Hensley's claims, to the extent they are construed as claims of negligence or medical malpractice, are subject to the Act's requirements. The court declines to exercise supplemental jurisdiction over those claims, which are dismissed without prejudice due to Mr. Hensley's failure to allege filing with the HCADRO.

## Conclusion

"Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985), citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir. 1970). Mr. Hensley's treatment for his hand and audiology problems was appropriate and timely. Mr. Hensley's additional condition affecting his spine and other joints is degenerative, and his medical needs may change in the future, requiring additional intervention. At present, however, there are no exceptional circumstances sufficient to overcome Defendants' assessment that they have provided Mr. Hensley appropriate, albeit conservative, treatment required for his current medical conditions.

Defendants' motion to dismiss or, alternatively, for summary judgment, construed as a motion for summary judgment, is granted. A separate Order follows.


February 25, 2019                    _____/s/_____
                                     DEBORAH K. CHASANOW
                                     United States District Judge